[Crim. No. 22994. July 5, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID WENDELL RUGGLES, Defendant and Appellant.

COUNSEL

Paul W. Grace, under appointment by the Supreme Court, and Stephen Yagman for Defendant and Appellant.

Quin Denvir, State Public Defender, and George L. Schraer, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders, Penina S. Van Gelder, William R. Weisman and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

John J. Meehan, District Attorney (Alameda), Wm. McKinstry, Senior Deputy District Attorney, and Sandra Margulies, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**GRODIN, J.**—Defendant David Wendell Ruggles was charged with (1) robbery (Pen. Code, § 211) with use of a firearm (Pen. Code, § 12022.5) and (2) possession of a firearm by an ex-felon (Pen. Code, § 12021). The information was amended to charge six prior convictions and the case was consolidated with a second case in which a single count of robbery was charged. Defendant pleaded not guilty, denied the priors, and moved to suppress evidence (Pen. Code, § 1538.5). Following hearing and denial of the motion to suppress, a plea bargain was negotiated whereby defendant withdrew his not guilty plea and entered a plea of guilty to one count of robbery, admitted the use allegation, and also admitted three of the six prior

convictions. The People agreed to dismiss both the remaining count charged in this information and a second information charging another offense.

The question before us on defendant's appeal is whether the trial court erred in denying his motion to suppress certain evidence which police obtained in a warrantless search of his car, and of a briefcase and two tote bags which they found in the car's locked trunk. We shall hold that the search of the car's interior was constitutionally permissible, but that the search of the briefcase and tote bags, absent a warrant, was in violation of article I, section 13 of the California Constitution. Since the crime for which defendant was charged occurred prior to the passage of Proposition 8 (Cal. Const., art. I, § 28), the motion to suppress should have been granted. (*People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].) Consequently, as we shall explain, defendant is entitled to withdraw his guilty plea subject to the right of the People to reinstate the original charges against him.

*Facts*

*The Robbery.*

John Carragher, manager of the Nutel Motel in Los Angeles, testified at the preliminary hearing that he was robbed by defendant on July 24, 1978: Defendant had twice come to the motel before the robbery, each time presenting a badge and representing himself as an officer with the Treasury Department; they discussed a "narcotic bust" involving a room at the motel.

Defendant reappeared at the motel on July 24, 1978. After he again identified himself as a "police officer," he was ushered into the manager's office. He was accompanied by a short "Latin male" of stocky build whom he introduced as his partner. As Carragher reached out to shake hands, defendant pulled an automatic pistol from his coat and threatened to shoot Carragher. Carragher was handcuffed. The robbers took about $5,000 from the desk and additional money from the safe.

Carragher made a tentative identification of defendant from a photo lineup card. He also identified defendant in a later lineup and from a passport photograph.

*The Investigation.*

Police Officer Robert McSeveney of the robbery-homicide division of the Los Angeles Police Department testified at the suppression hearing that in

November 1978 he received information from Sergeant Morosky of the intelligence division that defendant, a parolee who had been in prison for armed robbery, had participated in several armed robberies in the Los Angeles area. The informant had also reported to Morosky that defendant lived at a specified address in San Pedro, drove a black over red Mercury Montego and, accompanied by a male Latin, had been involved in a motel robbery in which a blue steel automatic and handcuffs had been used.

McSeveney checked the records division and obtained information on defendant's criminal background and his physical description. He also checked police records for current outstanding robberies in the Los Angeles area, including all hotel-motel robberies with Caucasian suspects, and came up with the Nutel Motel. After preparing a photo lineup card (booking photo and driver's license shot), McSeveney displayed the card to Carragher who—as already noted—tentatively identified defendant as the man who had robbed him.

McSeveney talked to law enforcement officers concerning other incidents involving defendant in Los Angeles and in other jurisdictions. He was advised that defendant had on two or three other occasions posed as an agent of the state "narcotics department" or of the Department of Justice. He also learned that defendant had engaged in two shoot-outs with the police, one in Orange County and one in Beverly Hills.

McSeveney concluded that defendant had committed the Nutel Motel robbery and that he had probable cause to arrest him. The actual arrest was put off, however, in order to place defendant under surveillance in hopes of arresting the accomplice as well. A daily watch of defendant and his residence was instituted.

*The Arrest.*

Officer McSeveney, who was not present at defendant's arrest, testified to the events that led up to it: On January 2, 1979, Sergeant Morosky told McSeveney that he had information that defendant and an accomplice were going to commit a major robbery. He informed McSeveney that defendant was to meet the accomplice at 8 o'clock in the morning of January 3, 1979, on Reseda Boulevard near the Ventura Freeway in the San Fernando Valley and that the two would rob a jewelry store in Santa Barbara. Morosky said that his informant had indicated that two handguns would be used, one a blue steel automatic, and that defendant normally carried one of the weapons on the small of his back and probably would have the second in a briefcase or satchel. McSeveney contacted the surveillance team and told them that defendant was armed and dangerous. They were made privy to all of the

information received from Morosky and instructed to stop and arrest defendant should he appear to be leaving Los Angeles County.

Los Angeles Police Officer Jerry Brooks testified to the arrest of defendant: As a member of the team, he set up a surveillance on the morning of January 3 in the area of Reseda Boulevard and the Ventura Freeway. In addition to Brooks, there were ten other officers, five or six unmarked police cars, one black and white (to effect the vehicle stop, if necessary), and a helicopter. The officers took up their positions at 7 a.m. and maintained radio contact with each other.

Having spotted defendant's automobile, Brooks watched defendant drive to a location on the north side of Irwin just east of Reseda Boulevard. Defendant parked and left the car. He continuously looked back and forth, up and down the street, and from side to side. He then went to the rear of the vehicle, opened the trunk, removed a brown briefcase, and, continuing to make careful observations of the area, entered an apartment building complex.

About 10 to 15 minutes later defendant returned to the car, again looked up and down the street, opened the trunk, and put the brown briefcase into it. He then drove onto the westbound Ventura Freeway. The surveillance team decided that defendant was about to leave the county and, therefore, stopped him. After the black and white police unit displayed a red light, defendant parked his vehicle on the shoulder in the center of the freeway. He immediately emerged from the car. Officer Brooks and other officers approached, displaying three or four handguns and at least one shotgun, all of which were pointed at defendant. Complying with instructions, defendant lay prone on the center divider, where he was handcuffed, patted down, and informed that he was under arrest. He was then stood up against the center divider fence. By this time at least five or six police vehicles and about ten to twelve officers had gathered.

Brooks looked into defendant's vehicle and, on the front seat, saw a small police-call scanner; in plain view on the back seat he saw narcotic paraphernalia, a large bottle wrapped in tinfoil, and two small vials such as frequently contain narcotics. He concluded that the paraphernalia were a "hype" kit and the vials and bottle contained controlled substances. Brooks took the keys to the vehicle from defendant and opened the car's trunk.[1]

---

[1] Brooks testified that he asked for consent to search the trunk and that defendant responded ". . . I don't care. Go ahead." In defendant's version, he responded ". . . you are going to do what you want to do anyway," and Brooks took the keys from his hand. The trial court found that ostensible consent to search the car constituted a submission to assertion of authority and was not a valid consent.

There he saw a second, larger (Bearcat) scanner for picking up police calls, a manual entitled "Police Frequencies," the brown briefcase, two duffel-type "tote" bags, and four or five Halloween-type masks with tape over the eyeholes. The briefcase contained a small unzipped bag which contained a gun. Also in the briefcase was a second gun, ammunition, a holster, a cap, handcuffs, gloves, a flashlight and a bandana. In the two "tote" bags Brooks found miscellaneous clothes, a "bank bag" and a small sledge hammer. The vehicle was later impounded.

*Motion to Suppress Evidence.*

Defendant moved to suppress all of the evidence found in the vehicle. The trial court denied the motion, finding (1) that the officers had probable cause to arrest defendant and therefore the right to stop his vehicle; (2) that they had probable cause to search the vehicle; and (3) that they had probable cause (a) to search the trunk and (b) to search the containers in the trunk— the briefcase and the two tote bags.[2]

Defendant raises three issues on appeal: (1) The officers did not have probable cause to arrest; (2) the officers did not have probable cause to conduct a warrantless search of the trunk; and (3) the search of the briefcase without a warrant was illegal.[3]

---

[2] The court stated that the officers had probable cause to conclude that the trunk contained evidence of crime and instrumentalities of crime, and probable cause "to believe that these containers on this occasion would contain weapons and other possible instrumentalities of crime, inasmuch as the officers' information was that the defendant, at that particular time, was on his way to commit a robbery of a jewelry store."

The court expressly noted that "it is not necessary for the court to make any holding, and the court does not hold that in all cases where there is probable cause to search a trunk compartment of a car that therefore the authorities have probable cause to open closed containers such as suitcases."

In a finding not pertinent to our discussion, the court also found that the narcotics paraphernalia observed through the window were in plain view and subject to seizure.

[3] This case is before us on a second remand from the United States Supreme Court. After a Court of Appeal opinion sustained the search and affirmed the conviction, the United States Supreme Court remanded for reconsideration in light of *Robbins* v. *California* (1981) 453 U.S. 420 [69 L.Ed.2d 744, 101 S.Ct. 2841]. *Robbins*, in a plurality opinion, had held that police officers who were entitled to conduct a warrantless search of an automobile stopped on a public roadway were not entitled to open a container found within the vehicle; the court rejected the argument that there is a constitutional distinction between searches of luggage and searches of "less worthy" containers.

The Court of Appeal reconsidered and applied *Robbins* to reverse the judgment, but the United States Supreme Court remanded again for reconsideration in light of *United States* v. *Ross* (1982) 456 U.S. 798 [72 L.Ed.2d 572, 102 S.Ct. 2157]. In *Ross,* the court overruled *Robbins* and adopted a rule that police officers who lawfully stop a vehicle, having probable cause to believe that contraband is located or concealed somewhere therein, may conduct a warrantless search of the vehicle that is as thorough (as to location and type of container searched) as that which a magistrate could authorize by warrant.

# I

## *Probable Cause to Arrest and to Search the Vehicle*

At this point, no one really disputes that the officers had probable cause to arrest defendant. As a result of McSeveney's investigation and Carragher's identification, the police had ample cause to arrest defendant for the Nutel Motel robbery.

As to the vehicle search, defendant's initial contention was that, absent a showing of exigent circumstances, the existence of probable cause to believe a vehicle contains contraband or evidence was not sufficient *in itself* to justify a warrantless search of a vehicle. That contention was rejected in all three intermediate decisions, which accepted the People's position that the "automobile exception" to the warrant requirement applied to validate the search of the vehicle, including the trunk.

In 1925, the United States Supreme Court had held in *Carroll* v. *United States,* 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790] that, because of its mobility, an automobile that is stopped on the highway may be searched without a warrant when police officers have probable cause to believe it contains contraband. *Chambers* v. *Maroney* (1970) 399 U.S. 42, 51-52 [26 L.Ed.2d 419, 428, 90 S.Ct. 1975], took the exception one step further, holding that if an immediate, warrantless search on the street is permissible, a search soon thereafter at the police station is also permissible even if the vehicle is immobile because it has been impounded. (See also *Texas* v. *White* (1975) 423 U.S. 67 [46 L.Ed.2d 209, 96 S.Ct. 304].) *Chambers* also, for the first time, interpreted *Carroll* as authorizing a general search of a vehicle for evidence of crime—as distinguished from contraband—without a warrant, in every case where probable cause existed. (399 U.S. at p. 62, fn. 7 [26 L.Ed.2d at p. 435].)

■ Although decisions since *Carroll* have alluded to a second limitation on its rule permitting a warrantless search on probable cause—i.e., the presence of "exigent circumstances"—*Carroll* contains no requirement of exigency other than the exigency created by the inherent mobility of the automobile itself. As we stated in *People* v. *Superior Court (Valdez)* (1983) 35 Cal.3d 11, 16 [196 Cal.Rptr. 359, 671 P.2d 863]: "Under the governing authorities, (1) the ready mobility of automobiles, (2) the lesser expectation of privacy in their contents, (3) the significant administrative expense, delay and risk of loss of contents entailed in requiring the police either to secure all automobiles at the scene or to tow all suspected vehicles to a securely maintained depot, and (4) the need for clear guidelines by which police may guide and regulate their conduct, have led to the adoption of a general rule

permitting the police to conduct an immediate, on-the-scene warrantless search of an automobile under such circumstances. (See *Chavers* [*People* v. *Chavers* (1983) 33 Cal.3d 462 (189 Cal.Rptr. 169, 658 P.2d 96)], at p. 469; *Arkansas* v. *Sanders* (1979) 442 U.S. 753, 760-761, 765, fn. 14 [61 L.Ed.2d 235, 242-243, 246, 99 S.Ct. 2586].)"

■ We come then to the question of probable cause. The probable cause determination that will validate a warrantless search of defendant's vehicle must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely the subjective good faith of the police officers. (*Carroll, supra,* 267 U.S. at pp. 161-162 [69 L.Ed. at p. 555].) When defendant and his vehicle were stopped on the Ventura Freeway, the officers had information that he was on his way to a robbery and that he was armed with a gun normally carried in the small of his back and another probably carried in a briefcase or satchel. They also knew he was dangerous, having engaged police officers in shoot-outs on two previous occasions. They had information identifying him as the robber of the Nutel Motel. They were also aware that his modus operandi on more than one occasion was to pose as an enforcement agent of the state or federal government and that he used handcuffs to immobilize his victims. These factors are what formed the basis for the trial court's conclusion that the officers had probable cause to search the vehicle, including the trunk, for weapons and other instrumentalities of crime and could have justified issuance of a warrant, had one been sought. We find no fault with the trial court's reasoning.

## II

### *Search of Containers in Trunk*

■ While the search of the car's interior was permissible on the basis of probable cause, the searches of the briefcase and tote bags present a different question, governed by a different line of cases.

In *People* v. *Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514] this court held that the warrantless search of a tote bag found in the trunk of defendant's car after his arrest was unlawful under the Fourth Amendment. In reaching this conclusion, we relied upon *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476], in which the United States Supreme Court reached a similar conclusion with respect to the warrantless search of a footlocker.

In *Chadwick,* the Supreme Court rejected the government's attempt to justify the search by analogy to the "automobile" exception to the warrant

requirement, noting that "[t]he factors which diminish the privacy aspects of an automobile do not apply to respondents' footlocker. . . . Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile." (*United States* v. *Chadwick, supra,* 433 U.S. at p. 13 [53 L.Ed.2d at p. 549].) In addition, as we observed in *Minjares,* "the court noted that luggage may be seized and held secure until a warrant is obtained. This is not always true of automobiles. (*Ibid.*) Thus, the court rejected the government's analogy, finding differences of constitutional dimension between the warrantless search of luggage and automobiles. [¶] . . . The increased expectation of privacy in the contents of the footlocker compelled the conclusion that with respect to luggage, immobilization, rather than immediate search, was the lesser intrusion. [Citation.] Thus real, rather than theoretical, exigencies are required before luggage may be searched without a warrant." (*People* v. *Minjares, supra,* 24 Cal.3d at p. 418.)

The holding in *Chadwick* was not necessarily dispositive in *Minjares,* the state argued, because in *Chadwick* the footlocker was initially observed by the police in a railroad station, and they waited until it had been placed in the trunk of a car before they seized it. We rejected that attempted distinction, stating that "[t]he principles underlying *Chadwick*—and the Fourth Amendment—are not altered because the luggage in this case was found in the course of a search of an automobile." (*People* v. *Minjares, supra,* 24 Cal.3d at p. 420.) "It would be anomalous indeed," we said, "if personal effects not otherwise subject to a warrantless search could be searched simply because they were found in an automobile. Given the omnipresence of automobiles in modern life, such a holding would considerably diminish individual privacy." (*Ibid.*)

Since *Chadwick,* the opinions of the United States Supreme Court have followed a wandering course. In *Arkansas* v. *Sanders* (1979) 442 U.S. 753 [61 L.Ed.2d 235, 99 S.Ct. 2586] the court appeared to adopt our analysis in *Minjares,* holding that "a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile." (*Id.,* at p. 764, fn. 13 [61 L.Ed.2d at p. 245].) In *Robbins* v. *California* (1981) 453 U.S. 420 [69 L.Ed.2d 744, 101 S.Ct. 2841], the court stated the proposition even more forcefully: referring to *Chadwick* and *Sanders* the court declared: "Those cases made clear, if it was not clear before, that a closed piece of luggage found in a lawfully searched car is constitutionally protected to the same extent as are

closed pieces of luggage found anywhere else." (*Id.,* at p. 425 [69 L.Ed.2d at p. 750].)

It was not until *United States* v. *Ross, supra,* 456 U.S. 798, that the Supreme Court expressed a contrary view.

In *Ross,* police officers received information from a reliable informant that one "Bandit," described in detail, was selling narcotics from a described vehicle at a stated location and had his supply in the vehicle's trunk. The officers observed the vehicle where it had been reported to be, although nobody fitting Bandit's description was nearby at the time, and determined through a license check that Ross owned it. They returned a few minutes later and observed someone driving the vehicle away; they intercepted it and noted that Ross, the driver, resembled Bandit. The officers arrested Ross, took his car keys, opened the trunk, and discovered a brown paper bag with glassine envelopes containing what later was determined to be heroin. In another warrantless search of the trunk at the police station, the officers found a zippered leather pouch containing cash.

Upholding the search of the trunk and the containers found therein, the Supreme Court rejected the holding in *Robbins* v. *California, supra,* 453 U.S. 420, and that portion of the opinion in *Arkansas* v. *Sanders* on which the plurality in *Robbins* had relied. Relying on the automobile exception recognized in *Carroll,* the court concluded that "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (*Ross,* 456 U.S. at p. 825 [72 L.Ed.2d at p. 594].)

Even *Ross* does not definitively determine the issue in this case. Defendant argues that this case is distinguishable from *Ross* because here the officers knew in which container they were likely to find at least one of the weapons. For that reason, he contends, the automobile exception upheld in *Ross* does not apply; the fact that the briefcase happened to be in an automobile did not justify a warrantless search absent both probable cause and exigent circumstances. One state supreme court has found merit in a similar argument (*Castleberry* v. *State* (Okla.Crim.App. 1984) 678 P.2d 720), and the United States Supreme Court has affirmed, but by an equally divided court without full opinion. (*Oklahoma* v. *Castleberry* (1985) — U.S. — [85 L.Ed.2d 112, 105 S.Ct. 1859] [decided Apr. 1, 1985].) Rather than await more definitive guidance, we turn to article I, section 13 of the California Constitution, and its "more exacting standard for cases arising within this state." (*People* v.

*Brisendine* (1975) 13 Cal.3d 528, 545 [119 Cal.Rptr. 315, 531 P.2d 1099].)[4]

In *Minjares,* we based our decision upon federal constitutional grounds, taking care to state that our opinion "intimates no views on how the validity of the search in this case would be decided under the California Constitution." (*People* v. *Minjares, supra,* 24 Cal.3d at p. 424, fn. 8.) Reaching that question now, we find the reasoning in *Minjares,* and in *Chadwick, Sanders,* and *Robbins* persuasive. Each day millions of Californians drive in automobiles, often taking with them, inside briefcases or other similar luggage, items of a highly personal or confidential nature. Permitting such containers to be searched on the basis of probable cause alone deprives the owner of the added protections of a warrant.[5] As we said in *Minjares,* "such a holding would considerably diminish individual privacy." (24 Cal.3d at p. 420.) On the other hand, requiring a warrant in such cases, absent consent to search or some exigency requiring search without a warrant,[6] imposes no undue burden upon the police, who are free to take and impound

---

[4]The alleged illegal conduct in this case occurred prior to the passage of Proposition 8 (Cal. Const., art. I, § 28), so that the admissibility of evidence obtained by the search is not affected by that provision. (*People* v. *Smith, supra,* 34 Cal.3d 251; cf. *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].)

[5]In its insistence that *Ross, supra,* 456 U.S. 798, affects only "the relatively few [Californians] whose briefcases and tote bags happen to be found in cars which the police have probable cause to search" (see *post* at p. 14), the dissenting opinion patently undervalues the historical significance of the warrant requirement in protecting the privacy of persons who may be *innocent* of any crime.

"[A] search warrant 'provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime"' [citations] . . . ." (*United States* v. *Leon* (1984) 468 U.S. 897, 913-914 [82 L.Ed.2d 677, 692-693, 104 S.Ct. 3405, 3416-3417].) Use of a warrant also limits the authorization to search to specific areas and specific things for which there is probable cause to search, thus, ensuring that the search is carefully tailored to its justification. (*Id.,* 468 U.S. at p. 963 [82 L.Ed.2d at pp. 724-725, 104 S.Ct. at p. 3448], Stevens, J., conc.) Additionally, requiring a written affidavit or a written transcription of an oral statement taken under oath (Pen. Code, §§ 1525, 1526) ensures that the facts which gave rise to probable cause that justified issuance of the warrant will not be augmented by knowledge gained after the search.

[6]It may be that the known presence of a firearm in a closed container would, in some situations at least, pose such a risk to the safety of police officers as to justify an immediate, warrantless search. (See *United States* v. *Chadwick, supra,* 433 U.S. 1, 15, fn. 9 [53 L.Ed.2d 538, 551]; *United States* v. *Johnson* (2d Cir. 1972) 467 F.2d 630, 639; *United States* v. *Moschetta* (5th Cir. 1981) 646 F.2d 955, 957, fn. 2, 959, judgment vacated and cause remanded (1982) 457 U.S. 1113 [73 L.Ed.2d 1324, 102 S.Ct. 2919], mod. (1982) 690 F.2d 488; but cf. *United States* v. *MacKay* (9th Cir. 1979) 606 F.2d 264, 265-266; *United States* v. *Musick* (N.D.Cal. 1982) 534 F.Supp. 954, 961-962; *Adams* v. *State* (Tex.App. 1982) 643 S.W.2d 423, 425-426, remanded on other grounds (Tex.Crim.App. 1982) 639 S.W.2d 942.) That exigency theory was neither presented to, nor litigated in, the suppression hearing in this case, however, and thus may not be advanced on appeal as a basis for admitting the evidence. (*Mestas* v. *Superior Court* (1972) 7 Cal.3d 537, 542 [102 Cal.Rptr. 729, 498 P.2d 977].)

the item until a warrant is obtained. "An individual who prefers immediate search rather than the inconvenience of immobilization may always consent to an immediate search." (*Id.*, at p. 423.) Accordingly, we reaffirm the holding in *Minjares* on the basis of article I, section 13 of this state's Constitution.

█ Because it is impossible to assess the impact of an erroneous denial of a motion to suppress evidence on a defendant's decision to plead guilty, the harmless error rule is inapplicable in appeals taken pursuant to Penal Code section 1538.5, subdivision (m). (*People* v. *Miller* (1983) 33 Cal.3d 545, 556 [189 Cal.Rptr. 519, 658 P.2d 1320]; *People* v. *Hill* (1974) 12 Cal.3d 731, 767-769 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872].) Therefore, defendant must be afforded the opportunity to withdraw his plea, in which case the People are free to reinstate the original charges.

The judgment is reversed and the cause remanded to the superior court. That court is directed to vacate the guilty plea if defendant moves to withdraw the plea within 30 days of the finality of this opinion. In that event, on motion of the People the original charges shall be reinstated and trial or other appropriate disposition shall proceed in accordance with the views expressed in this opinion. If defendant does not elect to withdraw his plea of guilty, the superior court shall reinstate the judgment.

Mosk, J., Broussard, J., and Reynoso, J., concurred.

Bird, C. J., concurred in the judgment.

**KAUS, J.—**

I

I respectfully dissent.

The majority somewhat grudgingly concedes that the warrantless search of the briefcase was permissible under *United States* v. *Ross* (1982) 456 U.S. 798, 824 [72 L.Ed.2d 572, 593, 102 S.Ct. 2157], and thus did not violate the Fourth Amendment. Nevertheless, we are told that there was a violation of article I, section 13 of the California Constitution because "[e]ach day millions of Californians drive in automobiles, often taking with them, inside briefcases or other similar luggage, items of a highly personal or confidential nature." This rationale for disagreeing with *Ross* is thoroughly misleading. *Ross* does not affect the millions of Californians men-

tioned by the majority, but the relatively few whose briefcases and tote bags happen to be found in cars which the police have probable cause to search.

My guess is that for every Californian who drives around with "highly personal or confidential" items in a briefcase, there is another Californian who drives with confidential matters on, under or tucked inside a car seat, in the glove compartment, the map pocket, the trunk, the wheel-well or under the hood. The majority's reasoning which relies solely on the number of potential searches, could therefore just as logically be the vehicle for the abandonment of our adherence to the *Carroll* principle that "because of their highly movable nature 'automobiles and other conveyances may be searched without a warrant in circumstances that would not justify the search without a warrant of a house or an office, provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize.' [Citation.]" (*People* v. *McKinnon* (1972) 7 Cal.3d 899, 907-908 [103 Cal.Rptr. 897, 500 P.2d 1097].) Yet as I read part I of the majority opinion, it is a ringing endorsement of *Carroll,* as recently explained in *People* v. *Superior Court (Valdez)* (1983) 35 Cal.3d 11, 16 [196 Cal.Rptr. 359, 671 P.2d 863] and *People* v. *Chavers* (1983) 33 Cal.3d 462, 469 [189 Cal.Rptr. 169, 658 P.2d 96].

II

Of course, the fact that there are no state obstacles to the application of *Carroll* to automobile searches does not dispose of the problem of containers found in searchable automobiles. I submit that the container cases are of two types, differing fundamentally in principle and practical considerations. The majority has unfortunately fused the two into one.

Type A is represented by the facts in *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476] and *Arkansas* v. *Sanders* (1979) 442 U.S. 753 [61 L.Ed.2d 235, 99 S.Ct. 2586]. In each case probable cause was confined to the container—a footlocker in *Chadwick,* a green suitcase in *Sanders.* In each case the officers waited until the container had been placed inside a vehicle and then proceeded to make a warrantless search of the container. Clearly in each case the temporary presence of the container in a vehicle was fortuitous and did not relieve the officers of the duty of obtaining a warrant for the search—a duty to which they had been subject before the container was put on wheels. One vital characteristic of the type A situation is that the officers do not have probable cause to believe that the vehicle itself—as distinguished from the container—contains seizable material.

In any event, as to type A *Chadwick* and *Sanders* remain good law and nothing in *Ross* questions either case on its facts.[1]

Type B is quite different. Here we start with probable cause to believe that the vehicle itself contains seizable matter. This matter may be anywhere—on or under a seat, in the glove compartment, the trunk or in various containers found in the vehicle. It is with respect to this type of situation that the United States Supreme Court first held in *Robbins* v. *California* (1981) 453 U.S. 420 [69 L.Ed.2d 744, 101 S.Ct. 2841] that closed containers found in vehicles could not be opened without a warrant, even though there was probable cause to search the vehicle itself. This is, of course, the holding which was abandoned in *United States* v. *Ross* (1982) 456 U.S. 798, 823 [72 L.Ed.2d 572, 593, 102 S.Ct. 2157], in favor of the rule that "[t]he scope of a warrantless search [of a car] is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize."[2]

## III

That this is a type B case needs no elaboration. Based on the informant's tip, their own surveillance, and the things found in the passenger compartment of the car, the police had probable cause to believe that the car contained at least two weapons, handcuffs, as well as other evidence and instrumentalities of crime. Only with respect to one of the weapons was there cause to believe that it would be in a briefcase. Nothing specific had been learned about the tote bags. Since any of the other items for which the police were looking could have been in the briefcase along with the weapon, it is clear that under *Ross* the police were as justified in searching that briefcase for those other items, as they were in searching the other containers in the

[1] *Sanders* did contain an unnecessary observation—disavowed in *Ross* (456 U.S. at p. 814 [72 L.Ed.2d at p. 587])—which "broadly suggested that a warrantless search of a container found in an automobile could never be sustained as part of a warrantless search of the automobile itself."

[2] As noted, the majority reluctantly concedes that in the federal arena this case would be governed by *Ross*. There is, however, a wistful expectation that somehow *Ross* might not be applicable if the United States Supreme Court should agree with the Oklahoma court in *Castleberry* v. *State* (Okla.Crim.App. 1984) 678 P.2d 720 (affd. by an equally divided ct. (1985) — U.S. — [85 L.Ed.2d 112, 105 S.Ct. 1859]) when it ultimately resolves the *Castleberry* issue. Not so. In *Castleberry*, probable cause was confined to certain luggage and a Band-Aid box which the police had seen placed in the car. It was held that a warrant for the search of the contents should have been obtained. *Castleberry* is, therefore, a type A case. The Oklahoma court expressly relied on *Chadwick* and *Sanders*.

car.[3] I stress this simply to emphasize that to reach its result the majority must squarely disagree with *Ross*—as indeed it eventually does.

I submit that the reasons for that disagreement are inadequate.

## IV

Long before "container" problems arose in the wake of *United States* v. *Chadwick, supra,* 433 U.S. 1, this court had no qualms about following *Chambers* v. *Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975] which upheld the warrantless search of a car which had been removed to the police station after the arrest of the occupants. Obviously the "mobility" of the vehicle was but a distant memory and one would suppose that the *Carroll* justification for a warrantless search—predicated on mobility— would no longer obtain. Nevertheless, a warrantless search at the station was permitted because, said the court, "[f]or constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant." Clearly the focus had now shifted from mobility to relative inconvenience: delay while the facts were presented to a magistrate as distinguished from immediate warrantless search.[4]

This court has enthusiastically endorsed the *Chambers* rationale. (*People* v. *Chavers* (1983) 33 Cal.3d 462, 468-469 [189 Cal.Rptr. 169, 658 P.2d 96]; *People* v. *Hill* (1974) 12 Cal.3d 731, 749-753 [117 Cal.Rptr. 393, 528 P.2d 1]; *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 223 [113 Cal.Rptr. 175, 520 P.2d 991]; *People* v. *Laursen* (1972) 8 Cal.3d 192, 201-202 [104 Cal.Rptr. 425, 501 P.2d 1145].)[5] Its relevance becomes apparent when one considers the practical rationale for the *Ross* rule as explained by the court: "The practical considerations that justify a warrantless search of an automobile continue to apply until the entire search of the automobile and its contents has been completed. Arguably, the entire vehicle itself (including its upholstery) could be searched without a warrant, with all wrapped articles and containers found during that search then taken to a magistrate. But

---

[3]The majority's condemnation of the warrantless search of the briefcase obviously does not rest on the fact that as to that container the officers had specific probable cause to believe it contained a weapon. They had no such specific cause concerning the two tote bags, the opening of which is also condemned.

[4]One might suppose that for the arrested occupants who had plenty of time on their hands, the choice would have been an easy one.

[5]These cases all involve probable cause to believe that the vehicle contains seizable material. They are to be distinguished from "inventory" cases such as *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84], which do not involve any element of probable cause.

prohibiting police from opening immediately a container in which the object of the search is most likely to be found and instead forcing them first to comb the entire vehicle would actually exacerbate the intrusion on privacy interests. Moreover, until the container itself was opened the police could never be certain that the contraband was not secreted in a yet undiscovered portion of the vehicle; thus in every case in which a container was found, the vehicle would need to be secured while a warrant was obtained. Such a requirement would be directly inconsistent with the rationale supporting the decisions in *Carroll* and *Chambers.*" (*United States* v. *Ross, supra,* 456 U.S. at p. 822, fn. 28 [72 L.Ed.2d at pp. 591-592].)

I find it hard to understand why an argument which this court accepted again and again in the *Chambers* situation—that, for constitutional purposes, the necessary delay in submitting the probable cause issue to a magistrate was an intrusion equal to an immediate warrantless search—should fail to gain acceptance in the container context. The only explanation which readily comes to mind is the fallacy I tried to expose at the outset of this dissent— that the *Ross* rule will affect millions of Californians who drive around with confidential and private matters in containers of various kinds. I again point out that this is a gross exaggeration of the problem since—like so many officers whom the courts are forced to educate in constitutional niceties—it ignores the issue of probable cause.

I would affirm.

Beacom, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.